IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | § | |
|---|---|---|
| ANTHONY TRISTANI, RADFORD TARRY, and MARK MARSHALL, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 6:19-cv-585-JDK |
| OPTIONSELLERS.COM, INC. and JAMES CORDIER, | § § § § | |
| Defendants. | § § § | |

## ORDER DENYING MOTION TO DISMISS OR TRANSFER

This case arises out of the alleged mismanagement of Plaintiffs' investments by Defendants OptionSellers.com, Inc.'s ("OptionSellers") and James Cordier. Defendants have moved to dismiss the action pursuant to an arbitration agreement they did not sign or, alternatively, to transfer the case pursuant to a forum selection clause in a separate agreement they also did not sign. Docket No. 6. For the reasons explained below, the Court **DENIES** the motion.

### I.    BACKGROUND

Defendant OptionSellers is a Commodity Trading Advisor ("CTA") founded and managed by Defendant James Cordier. Docket No. 6 at 4. Plaintiffs Anthony Tristani, Radford Tarry, and Mark Marshall each engaged OptionSellers to manage investments in his commodity futures and options markets. *See* Dockets No. 6-1 at 41–43, Docket No. 6-2 at 51–53; Docket No. 6-3 at 42–45.

**A.**

At the beginning of their relationship, each Plaintiff and OptionSellers entered into a Qualified Eligible Person Advisory and Fee Payment Authorization Agreement (the "Advisory & Authorization Agreement"). Docket No. 6-1 at 41–43; Docket No. 6-2 at 51–53; Docket No. 6-3 at 42–44. This agreement authorized OptionSellers to select and direct the trades for each Plaintiff, but not to receive, hold, or handle any customer funds. Docket No. 6 at 4. For purposes of handling funds, the agreement required each Plaintiff to open and fund an account with a futures commission merchant. *E.g.*, Docket No. 6-1 at 41. The agreement also permitted OptionSellers to charge commissions and fees, limited OptionSellers' liability to Plaintiffs, and expressly stated that "[t]his Agreement constitutes the entire agreement between the parties." *E.g.*, Docket No. 6-1 at 42.

As required by the Advisory & Authorization Agreement, each Plaintiff opened an account with a futures commission merchant—specifically, the FCM Division of INTL FCStone Financial Inc. ("FCStone"). Docket No. 6-1 at 2–35; Docket No. 6-2 at 2–45; Docket No. 6-3 at 2–36. FCStone is a large, publicly traded financial services organization that holds customer funds and executes trades at the direction of customers or their agents. Docket No. 6 at 4. In opening their accounts, each Plaintiff entered into several agreements with FCStone.

Among these agreements was a Futures & Exchange-Traded Options Customer Agreement (the "Customer Agreement"). Docket No. 6-1 at 19–29; Docket No. 6-2 at 28–38; Docket No. 6-3 at 22–30. This agreement established a non-

discretionary account with FCStone, authorized FCStone to purchase and sell commodity interests in accordance with the instructions of each Plaintiff or his agent, and disclaimed liability for the actions of any agent acting on Plaintiff's behalf. *Id*. The agreement included an Illinois choice of law provision and stated that any controversy between FCStone and Plaintiff "arising out of this agreement . . . shall be arbitrated or litigated in a court of law or otherwise resolved by a tribunal located in Chicago, Illinois." *E.g.*, Docket No. 6-1 at 27.

Each Plaintiff also signed a separate Arbitration Agreement stating that "[a]ny controversy or claim arising out of or relating to your account shall be settled by arbitration." Docket No. 6-1 at 30; Docket No. 6-2 at 39; Docket No. 6-3 at 32. Although FCStone did not sign this document, the header indicates it was created by FCStone, and the agreement states that Plaintiff need not sign this agreement "to open an account" with FCStone. *Id*.

Finally, each Plaintiff signed a Managed Account Agreement and Power of Attorney. Docket No. 6-1 at 32–35; Docket No. 6-2 at 42–45; Docket No. 6-3 at 33–36. This agreement, between each Plaintiff and FCStone, authorized FCStone to allow OptionSellers to buy, sell, and trade in commodity futures on Plaintiff's behalf. *Id*. The agreement also stated that FCStone did not endorse OptionSellers "or its trading style or system" and that FCStone would not be liable "for any action or inaction by [OptionSellers]." *Id*. At the end of this agreement was a statement signed by Defendant James Cordier acknowledging that he had read the agreement and identifying himself as "Agent for the Principal named herein." *Id*.

## B.

After opening their accounts, Plaintiffs collectively funded their FCStone accounts with $2,000,000. Docket No. 6 at 6. OptionSellers invested those funds heavily in naked call options on natural gas futures and naked put options on crude oil. Docket No. 11 at 2. When the market price of natural gas sharply increased in November 2018, the value of each Plaintiff's account at FCStone fell below zero. Docket No. 6 at 7. At that point, in addition to losing all their invested funds, Plaintiffs actually owed FCStone money. *Id*.

In November 2019, Plaintiffs filed this lawsuit alleging that Defendants made several misrepresentations in establishing their relationship and implemented "a grossly speculative options trading strategy" contrary to Plaintiffs' intentions. Docket No. 2 ¶ 1. Plaintiffs brought state law claims of misrepresentation/omission, negligent misrepresentation, breach of fiduciary duty, negligence, and negligent supervision, and sought damages of at least $2,200,000. Docket No. 2.[1]

Defendants now move to dismiss the action in favor of arbitration or, alternatively, to transfer it to the Northern District of Illinois.

## II. MOTION TO DISMISS

Defendants argue that the Arbitration Agreement signed by Plaintiffs requires dismissal in favor of arbitration even though Defendants themselves did not sign that agreement. Invoking the Federal Arbitration Act, Defendants urge the Court to "rigorously enforce" the Arbitration Agreement here because it was one of several

---

[1] Plaintiffs originally sued Defendants in state district court in Cherokee County, Texas. Defendants removed the suit to this Court based on diversity jurisdiction. Docket No. 1.

instruments that should be construed as a single contract governing Plaintiffs, Defendants, and FCStone. Docket No. 6 at 7–9. Even if the agreements are not construed as one, Defendants argue, equitable estoppel precludes Plaintiffs from bringing this suit because their claims here rely on the agreements with FCStone. *Id.* at 10. As explained below, the Court rejects both arguments.

**A.**

The first step when applying the Federal Arbitration Act is to determine "whether the parties agreed to arbitrate the dispute in question." *Gross v. GGNSC Southaven, L.L.C.*, 817 F.3d 169, 176 (5th Cir. 2016) (quoting *Tittle v. Enron Corp.*, 463 F.3d 410, 418 (5th Cir. 2006)). While federal policy strongly favors arbitration, no presumption applies in determining whether the parties have agreed to arbitrate. *Id.* (citing *Am. Heritage Life Ins. Co. v. Lang*, 321 F.3d 533, 537 (5th Cir. 2003)). Rather, when deciding whether a valid agreement to arbitrate exists between the parties, the Court should apply ordinary state law contract principles. *Id.* (citing *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir.1996)). The parties appear to agree that Texas law applies to this question.[2]

The primary question raised by Defendants is whether the Arbitration Agreement was part of a single contract governing Plaintiffs, Defendants, and FCStone, or whether it was a separate agreement governing only Plaintiffs and FCStone. "Texas courts have long recognized that, under appropriate circumstances,

---

[2] Although Defendants mention Illinois law in a single footnote, both parties rely almost exclusively on Texas law in arguing this issue. Further, Defendants acknowledge that "Illinois law . . . is to the same effect" as Texas law on this issue. Docket No. 6 at 9 n.3.

5

'instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other.'" *Rieder v. Woods*, --- S.W.3d ---, 2020 WL 3117141, at *6 (Tex. June 12, 2020) (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000)). In those circumstances, multiple separate contracts, documents, and agreements can be considered a single, unified agreement. *Id.*

This rule can apply even when the various instruments are not between the same parties. *Jones v. Kelley*, 614 S.W.2d 95, 98 (1981) ("Contemporaneously executed contracts which are part of the same transaction and which relate to the same subject matter are construed as one contract even if not between the same parties."); *see also Vince Hagen Co. v. Eighty-Eighty Cent. Partners, Ltd.*, No. 87-CA-1043-G, 1989 WL 136870, at *3 (N.D. Tex. Nov. 7, 1989) ("Contemporaneously executed contracts which are part of the same transaction and which relate to the same subject matter are construed as one contract even if not between the same parties." (citing Washington law)). Courts, however, must exercise caution when construing multiple documents together, as the ultimate goal is to determine and give effect to the parties' intent at the time of the agreements. *Rieder*, 2020 WL 3117141, at *6; *see also Miles v. Martin*, 321 S.W.2d 62, 65 (Tex. 1959).

Based on the language of the various agreements and the facts and circumstances surrounding their execution, the Court concludes that the agreements

6

here should not be construed as a single contract. *See Rieder*, 2020 WL 3117141, at *7.

**1.**

Each Plaintiff signed multiple agreements when he engaged Defendants' services and opened an account at FCStone. But the text of these documents makes clear that each had a distinct purpose, established separate obligations, and applied to different parties. *See Rieder*, 2020 WL 3117141, at *7 (documents with different parties, purposes, and obligations should not be construed together).

For example, the Advisory & Authorization Agreement states that it is "for advisory services" and is "made by and between OptionSellers.com, Inc. . . . and the individual/entity signing this Agreement below, hereinafter referred to as the 'Client.'" Docket No. 6-1 at 41. The primary purpose of the document is to authorize OptionSellers to direct trades on Plaintiff's behalf in exchange for commissions and fees. Although the agreement required each Plaintiff to "open an account . . . with a futures commission merchant," nothing in the document required Plaintiffs to open an account with any particular provider, including FCStone.

Conversely, the purpose of the Customer Agreement between each Plaintiff and FCStone was to establish an account for the purchase and sale of futures and option contracts, and it imposed distinct obligations on Plaintiff and FCStone in maintaining that account. The agreement begins with this clear statement of the parties and its purpose:

> This Futures & Exchange-Traded Options Customer Agreement (the "Agreement") is entered into as of the date below ***between the undersigned Customer and the FCM Division of INTL FCStone***

7

> *Financial Inc.*, acting in its capacity as a futures commission merchant ("FCM"), (each referred to individually as a "Party" or collectively, the "Parties") to enable the Customer to establish a nondiscretionary account, unless additional documents are executed relating to a discretionary account, for the purchase and sale of futures contracts, option contracts thereon, commodity futures, cash commodities forward contracts, currency conversions, on-exchange foreign currency-denominated financial instruments, cleared swaps and transactions related thereto ("Commodity Interests").

Docket No. 6-1 at 19 (emphasis added).

Further, neither the Advisory & Authorization Agreement nor the Customer Agreement mentions or refers to the other agreement. *See Rieder*, 2020 WL 3117141, *7 (agreements had different purposes and did not refer to one another). The header on every page of the Customer Agreement is "**INTL FCStone**." Docket No. 6-1 at 19–29; Docket No. 6-2 at 28–38; Docket No. 6-3 at 22–30. No such header appears on the Advisory & Authorization Agreement, which instead begins with the name and address of OptionSellers.com, Inc. Docket No. 6-1 at 41; Docket No. 6-2 at 51; Docket No. 6-3 at 42. The Customer Agreement with FCStone, moreover, does not require Plaintiffs to authorize OptionSellers to manage the account, but permits each Plaintiff to manage and use his FCStone account as he saw fit, including directing trades on his own behalf or using a different agent.

Similarly, the Arbitration Agreement includes the "**INTL FCStone**" header and, by its own terms, applies only to claims "arising out of or relating to your accounts." Docket No. 6-1 at 30. The Arbitration Agreement never mentions OptionSellers. And the Advisory & Authorization Agreement with OptionSellers never mentions the Arbitration Agreement or refers to arbitration in any way.

8

To be sure, each Plaintiff here signed a Managed Account Agreement and Power of Attorney with FCStone, which authorized OptionSellers to conduct trades on Plaintiff's behalf. Docket No. 14 at 3. But that agreement explicitly stated that Plaintiff was free to revoke this agency authorization at any time. *E.g.*, Docket No. 6-1 at 32. And such termination would have no effect on Plaintiff's FCStone account. Defendants argue that OptionSellers is a party to this agreement because James Cordier signed a statement at the end acknowledging "my legal responsibilities" as a third-party agent. Docket No. 14 at 3–4. The language of the agreement, however, shows otherwise: "This Managed Account Agreement and Power of Attorney ('Managed Account Agreement') is entered into as of the date below between the undersigned Customer [Plaintiff] and the FCM Division of INTL FCStone Financial Inc. acting in its capacity as a futures commission merchant ('FCM')." Docket No. 6-1 at 32. The agreement merely documented the agency relationship between each Plaintiff and OptionSellers, but did nothing to make OptionSellers a party to each Plaintiff's agreement with FCStone. And, as Defendants explain, "OptionSellers selected the trades for its customers' accounts . . . but did not receive, hold, or handle any customer funds." Docket No. 6 at 9.

The various agreements thus demonstrate that each Plaintiff was entering two separate relationships with distinct purposes: one with FCStone to establish a trading account, and a second with OptionSellers to manage trades in that account. *See Rieder*, 2020 WL 3117141, at *7; *Miles*, 321 S.W.2d at 66 (explaining that construing separate instruments as one contract is "simply a device for ascertaining

9

and giving effect to the intention of the parties and cannot be applied arbitrarily and without regard to the realities of the situation"); *A.J. Robbins & Co. v. Roberts*, 610 S.W.2d 854, 856–57 (Tex. Civ. App.—Amarillo 1980, writ ref'd n.r.e.) (contrasting separate contracts that were "intrinsically complete" and having "a distinct and separate purpose with those that "must be put together in order to ascertain a single contractual obligation").

**2.**

Further weighing against construing the FCStone and OptionSellers documents as a single contract is the fact that each Plaintiff's Advisory & Authorization Agreement with OptionSellers includes a merger clause: "This Agreement constitutes the entire agreement between the parties, and no modifications or amendments of this Agreement shall be binding unless in writing and signed by the parties hereto." *E.g.*, Docket No. 6-1 at 42.

Where various agreements impose separate obligations concerning distinct subject matter and are between differing parties, a merger clause supports interpreting those agreements separately, rather than as a unified instrument. *Rieder*, 2020 WL 3117141, at *8. In fact, reading the contracts together risks nullifying the merger clause, as the Advisory & Authorization Agreement cannot be "the entire agreement between the parties" if the parties intended several other separate documents to be a part of that agreement. *Id.* While inclusion of a merger

clause is not dispositive,[3] here it weighs against reading the various agreements as a single contract. *See id*.

### 3.

Additionally, Plaintiffs are sophisticated investors with extensive experience in securities, significant incomes, and substantial assets. *See* Docket No. 6-1 at 2–4; Docket No. 6-2 at 2–3; Docket No. 6-3 at 2–5. Each was investing a considerable sum of money. Defendants too are sophisticated, tout their expertise in the U.S. derivatives industry, and drafted the Advisory & Authorization Agreement governing their relationship with Plaintiffs. *See* Docket No. 6 at 4. In these circumstances, it is unlikely that either side ignored or overlooked the nuances of the various agreements at issue. And based on the text of those agreements, the stated purpose of each document, and the inclusion of a merger clause in the agreement between Plaintiffs and Defendants, the Court concludes that these documents are not a single contract that should be construed together. Accordingly, based on the evidence presented, the Court finds that the parties have not agreed to arbitrate the dispute presented in this case. *See Gross v. GGNSC Southaven, L.L.C.*, 817 F.3d 169, 176 (5th Cir. 2016).

### B.

Defendants also argue that equitable estoppel requires dismissal in favor of arbitration here. On this issue, federal law controls. *See, e.g.*, *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010) (citing *Wash. Mut. Fin.*

---

[3] *See, e.g.*, *In re Laibe Corp.*, 307 S.W.3d 314, 317 (Tex. 2010).

*Grp., L.L.C. v. Baily*, 364 F.3d 260, 267 n.6 (5th Cir. 2004)). Fifth Circuit law "will allow a nonsignatory to invoke an arbitration agreement only in rare circumstances." *Westmoreland v. Sadoux*, 299 F.3d 462, 465 (5th Cir. 2002). Specifically, a non-signatory may rely on equitable estoppel to compel arbitration in two distinct circumstances: "First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory. . . . Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000) (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)).

Plaintiffs' causes of actions here—misrepresentation/omission, negligent misrepresentation, breach of fiduciary duty, negligence, and negligent supervision—do not rely on their agreements with FCStone. Those agreements governed each Plaintiff's relationship with FCStone, as explained above. It is Defendants' alleged actions—misrepresenting how they would manage Plaintiffs' accounts, failing to execute an agreed-upon strategy, and mismanaging the choice of trades—that form the basis of Plaintiffs' claims here. As Defendants acknowledge, while FCStone held all customer funds and executed customer trades at OptionSellers' direction, it was OptionSellers that "selected the trades for its customers' accounts." Docket No. 6 at 4. Defendants, moreover, have not cited any provision in Plaintiffs' agreements

12

with FCStone on which Plaintiffs must rely here to assert their claims. As courts have held in similar cases, Plaintiffs' claims therefore do not rely on those agreements. *See, e.g.*, *Weingarten Realty Investors v. Miller*, 495 F. App'x 418, 422 (5th Cir. 2012) (arbitration not required where plaintiff did not bring any claims based on defendant's obligations under relevant agreement); *Palmer Ventures LLC v. Deutsche Bank AG*, 254 F. App'x 426, 431 (5th Cir. 2007) (finding equitable estoppel did not compel arbitration where plaintiffs' claims were based on misrepresentations predating relevant agreement and agreement was barely mentioned in complaint); *Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir. 2002) (no equitable estoppel where plaintiff did not "rely upon the terms of the [] agreement or seek to enforce any duty created by the agreement")..

Defendants do not appear to argue that the second basis for estoppel—substantially interdependent and concerted misconduct—applies here. And the Court sees no evidence of that. As previously explained, FCStone handled the funds and executed the trades. But Defendants present no evidence that FCStone participated in marketing Defendants' services to Plaintiffs, developing the trading strategy Defendants applied to Plaintiffs' accounts, or selecting any of the transactions Plaintiffs complain about in this case. *See Palmer Ventures*, 254 F. App'x at 432 (second prong not met where defendant failed to show specific instances of intertwined misconduct); *Westmoreland*, 299 F.3d at 467 (second prong not met where there was "no allegation that [defendant] acted in concert with anyone")..

Accordingly, equitable estoppel does not compel arbitration here.

* * * *

Because neither the Arbitration Agreement nor equitable estoppel requires that the parties arbitrate this dispute, the Court **DENIES** Defendants' motion to dismiss Plaintiffs' claims in favor of arbitration.

### III. MOTION TO TRANSFER

Alternatively, Defendants move to transfer this action to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a).

### A.

A district court may transfer any civil case "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). The threshold issue in determining eligibility for transfer is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *In re Volkswagen AG* ("*Volkswagen I*"), 371 F.3d 201, 203 (5th Cir. 2004). Once that threshold inquiry is met, the Fifth Circuit requires consideration of several public- and private-interest factors. The private-interest factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. *Id.* The public-interest factors include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law. *Id.* These factors are neither exhaustive nor exclusive, and no single factor is

dispositive. *In re Volkswagen of Am., Inc.* ("*Volkswagen II*"), 545 F.3d 304, 315 (5th Cir. 2008). The movant must show good cause for the transfer—that is, it must demonstrate that the transferee venue is "clearly more convenient" than the transferor venue. *Id.*

### B.

#### 1.

Defendants argue that a forum selection clause in the Customer Agreement between Plaintiffs and FCStone requires transferring this action to the Northern District of Illinois. Docket No. 6 at 13–17. As Defendants explain, a valid forum-selection clause alters the typical analysis and "[a] valid forum-selection clause controls the *forum non conveniens* inquiry in all but the most unusual cases." *Id.* at 14 (quoting *Barnett v. DynCorp In'tl, L.L.C.*, 831 F.3d 296, 300 (5th Cir. 2016). Defendants base their argument that the Customer Agreement's forum selection clause is binding here on the same legal theory as their primary argument for arbitration—i.e., that the Customer Agreement is one of several instruments that should be construed as a single contract between each Plaintiff, Defendants, and FCStone. *Id.* at 15 n.4. But as explained above, the various agreements are not a single contract to be construed together. *See* Section II.A. And Defendants provide no further explanation for why Plaintiffs are subject to the forum selection clause in their Customer Agreements with FCStone for this dispute with Defendants.

#### 2.

Defendants also urge transfer because several similar cases are already pending in the Northern District of Illinois, and another district court recently

15

transferred a similar case to Illinois. Docket No. 6 at 5–6. Defendants, however, ignore a critical distinction. In each of those cases, FCStone, undeniably a party to the Customer Agreement that includes the forum selection clause, is a party to the lawsuit. *See INTL FCStone Fin., Inc. v. Jacobson*, No. 1:19-cv-1438, 2019 WL 2356989, at *1 (N.D. Ill. June 4, 2019); *INTL FCStone Fin. Inc. v. Farmer*, No. 1:19-cv-1629 (N.D. Ill. Mar. 7, 2019); *Miller v. INTL FCStone Fin., Inc.*, No. 1:19-cv-00717, Docket No. 16 (N.D. Ga. Nov. 21, 2019). Not so here. Accordingly, the location of other pending suits—against FCStone—is not relevant in determining whether the Customer Agreement's forum selection clause applies to Defendants.

**3.**

Defendants have also failed to show that this case should be transferred under a traditional § 1404(a) analysis.

Defendants make no argument—and it is not clear from the record—that Plaintiffs could have brought this case in the Northern District of Illinois, as required for a § 1404(a) transfer.[4] Under 28 U.S.C. § 1391(b):

A civil action may be brought in—

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

---

[4] Section 1404(a) also allows a transfer to "any district or division to which all parties have consented." But because the Court finds that the forum-selection clause does not apply between Plaintiffs and Defendants here, there is no evidence that Plaintiffs have consented to venue in the Northern District of Illinois for this dispute.

16

> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

Here, Defendants are citizens and residents of Florida, not Illinois. Docket No. 1 ¶¶ 5–6. And Defendants argue that "all their conduct necessarily took place in Florida." Docket No. 14 at 10. Accordingly, the Court has no reasonable basis to conclude that this case could have been brought in Illinois.

Further, Defendants have failed to carry their burden to show that transferring this action to the Northern District of Illinois would be "clearly more convenient" for the parties. Defendants assert that because Plaintiffs' accounts were located at FCStone in Chicago, and options trades were executed on the Chicago Mercantile Exchange, "many of the witnesses and records pertinent to this dispute are in Chicago." Docket No. 6 at 17. But this vague generalization is insufficient. "Parties must *specifically identify* the relevant sources of proof (and why they are relevant), and *specifically identify* the physical location of those sources of proof. Without doing so, no court is able to make an informed inquiry into the true convenience of the parties." *Seven Networks, LLC v. Google LLC*, Nos. 2:17-cv-441, 2:17-cv-442, 2018 WL 4026760, at *2 (E.D. Tex. Aug. 15, 2018) (citing *Utterback v. Trustmark Nat'l Bank*, 716 F. App'x 241, 245 n.10 (5th Cir. 2017)). Without identifying what records or witnesses are in Chicago, or the relevance of those records or witnesses, the Court cannot make an informed determination of convenience based on the private-interest factors.

Defendants also fail to show that any of the public-interest factor favors transfer. They do not argue that the Northern District of Illinois faces less court

congestion than this Court. Defendants argue that Plaintiffs' agreements are governed by Illinois law—under the same Customer Agreement clause the Court finds does not apply to this dispute. Docket No. 6 at 17. That clause is therefore irrelevant in the transfer analysis. Defendants provide no other explanation for what law should apply to this dispute or why the Northern District of Illinois would be more familiar with that law. In fact, one public-interest factor—the local interest in having localized controversies decided at home—plainly weighs against transfer to Illinois. In a dispute between Texans and Floridians, either of those states would be a more relevant forum than Illinois.

In sum, Defendants have failed to show that any of the private- or public-interest factors favor transfer.

\* \* \* \*

Because the forum-selection clause does not apply and because Defendants have failed to demonstrate that the Northern District of Illinois is clearly a more convenient venue, the Court **DENIES** the motion to dismiss this case for *forum non conveniens* or to transfer it to the Northern District of Illinois.

## IV. CONCLUSION

Defendants have not demonstrated that the parties agreed to arbitrate their dispute or that equitable estoppel compels arbitration here. Further, Defendants have not shown that the forum selection clause in the Customer Agreement requires a transfer of this case or that a transfer would be more convenient for the parties. Accordingly, Defendants' motion to dismiss or transfer is **DENIED**.

Also pending before the Court is Plaintiffs' motion for discovery (Docket No. 13). In their motion, Plaintiffs request discovery as to whether either Defendant is an "Introducing Broker"—a term used in the Arbitration Agreement. Plaintiffs argue that this discovery may be necessary to defeat Defendants' motion to dismiss. Having resolved the underlying motion, Plaintiffs' requested discovery is no longer needed for the stated purpose. Accordingly, Plaintiffs' motion for discovery is **DENIED AS MOOT**.

So **ORDERED** and **SIGNED** this **12th** day of **August, 2020.**

_____
JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE